IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-00821-PSF

MARIA ALARID,

     Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

     Defendant.

---

## ORDER ON SOCIAL SECURITY APPEAL

---

This matter was set for oral argument on March 24, 2006 at 10:00 a.m. on plaintiff's appeal of denial of social security benefits.  The Court has received the arguments and submissions of counsel, VACATES the hearing set for March 24, 2006, and enters the following Order.

**BACKGROUND**

Plaintiff Maria Alarid appeals from the decision of the Commissioner denying social security disability benefits. The decision of the Commissioner became final on March 2, 2005 when the Appeals Council notified plaintiff that it found no reason to review the decision of the Administrative Law Judge, which had been entered on April 9, 2004.  Plaintiff timely filed her appeal from the final decision of the Commissioner on May 3, 2005.  The Court has jurisdiction to review the final decision of the Commissioner of Social Security under 42 U.S.C.§ 405(g).

Plaintiff filed her claim for benefits on February 4, 2002, seeking disability benefits beginning January 24, 2002, due to arthritis and pain in the hands, arms, feet

and back (AR[1] 49, 58).  After the initial denial of benefits, a hearing was held on March

4, 2004 before the Administrative Law Judge.  Plaintiff, represented by counsel,

testified at the hearing as did vocational expert Dennis Duffin (AR 130-61).  At the

outset of the hearing plaintiff amended the alleged date of the onset of disability to

January 1, 2001 (AR 16).  Plaintiff's application was denied in a written decision by

the Administrative Law Judge issued on April 9, 2004 (AR 16-22).  After the Appeals

Council denied plaintiff's request for review of the ALJ's decision on March 2, 2005

(AR 4-6), plaintiff filed this appeal from the Commissioner's decision.

**THE ALJ'S DECISION OF APRIL 9, 2004**

       In his written decision of April 9, 2004, the Administrative Law Judge apparently

accepted that plaintiff met the disability insured status on January 1, 2001, the date of

her alleged onset, but found based on a review of her earnings records that she

remained insured only through September 30, 2002 (AR 16).  Therefore, the ALJ stated

that in order for plaintiff to be entitled to disability benefits she must establish disability

on or prior to September 30, 2002 (*Id*).

       The  ALJ denied plaintiff's application for benefits at step four of the five-step

process.  *See generally Williams v. Bowen,* 844 F.2d 748, 750-52 (10th Cir. 1988).  The

ALJ found that plaintiff had the residual functional capacity to return to her past

relevant work as a van driver (AR 21).

       In reaching his determination the ALJ found that the evidence supported a

finding that plaintiff was suffering from arthritis, an impairment which causes significant

vocationally relevant limitations (AR 17).  However, the ALJ found that plaintiff's

---

[1]   The Administrative Record in this case (AR) consists of one volume, pp. 1-161.

arthritic condition did not meet the listed impairments of Appendix 1 to Subpart P of the Social Security regulations (AR 18), a finding which plaintiff apparently does not challenge on this appeal.

The ALJ further found that complaints of other conditions including hypothyroidism, possible cardiac impairment and depression were not supported by the evidence of record (*id. at* 17-18).  It appears that plaintiff does not challenge these findings on appeal.

The ALJ further found that plaintiff retained the residual functional capacity ("RFC") to lift and or carry up to 20 pounds occasionally and 10 pounds frequently, that she was unlimited in her ability to sit, and could stand and/or walk for at least six hours in an eight-hour workday (AR 18).  This allowed plaintiff to perform "an essentially full range of light exertional work." (AR 19).  Based on a "Past Relevant Work Summary" prepared by the vocational expert (AR 82-3), and based on the vocational expert's testimony (AR 156-59), the ALJ concluded that plaintiff's past work as a van driver was a light, semi-skilled job as generally performed in the national economy (AR 20), and that plaintiff's past relevant work as a van driver did not require the performance of work-related activities precluded by her residual functional capacity (AR 21).  He also found that her experience in performing this work in year 2000, when she worked for five hours per day for five days per week, for a period of approximately two and one-half months (*see* AR 154) provided her with experience to learn the requirements of the job (AR 21).

The ALJ based his findings as to plaintiff's RFC primarily on a consultative examination performed on October 12, 2002 by Dr. Mark Perea (AR 108-16) and to

some degree on a RFC assessment and consultative examination performed by a state

agency physician, Dr. George Twombly, on April 16, 2002 (AR 96-103).

Based on his examination of October 12, 2002, Dr. Perea reported that plaintiff

complained of pain in her neck that radiates into both arms, and some weakness in her

hands and upper extremities (AR 108).  She reported some difficulty in doing

housework, but was able to perform cooking and cleaning although it takes her a long

time (*id.*).  Based on his examination, Dr. Perea observed that plaintiff appeared in no

acute distress, she could ambulate without difficulty, she could get on and off the

examination table with ease, and could take off and put on her shoes without difficulty

(AR 109).  He found no joint swelling, or paravertrebal spasms and noted no crepitus[2]

or effusions.[3]  (AR 110).  His functional assessment of plaintiff stated that:

> There are no objective findings on examination to justify
> limitations.  However, if the history is taken into account she
> would have some limitations.   The number of hours that the
> claimant could be expected to stand and walk in an eight-
> hour work day is unrestricted.  The number of hours that the
> claimant could sit in an eight-hour work day is unrestricted.
> The amount of weight that the claimant would be able to lift
> and carry would be 10 pounds frequently and 20 pounds
> occasionally secondary to her bilateral shoulder pain.  Her
> postural limitations are unrestricted.  Her manipulative
> limitations would be limited frequently due to her bilateral
> shoulder pain.  Particularly, she would have difficulty with
> overhead lifting and overhead maneuvering.  There are
> no visual, communicative, or workplace environmental
> limitations.

---

[2]  Crepitus, a clinical orthopedic sign is defined as : "A crinkly, crackling or grating feeling or sound in the joints, skin or lungs." <http://cancerweb.ncl.ac.uk/cgi-bin/omd?query= crepitus &action=Search+OMD.>

[3]  Effusion is defined as: "The escape of fluid into a part or tissue, as an exudation or a transudation." <http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=effusion+&action=Search +OMD.>

(AR 111).

Dr. Perea also completed a residual functional capacity evaluation (AR 113-16) indicating that plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally, with no limitations on standing, walking or sitting (AR 113-14).  He did indicate limitations on pushing and pulling with her upper extremities due to shoulder pain, but no postural limitations (AR 114).  He appears to have found a reaching limitation involving "overhead lifting and maneuvering." (AR 115).

In his April 2002 assessment, Dr. Twombly found that plaintiff had the residual functional capacity to lift and carry 25 pounds frequently, 50 pounds occasionally, stand, walk and sit six hours in an eight-hour day with no postural limitations (AR 97-98).  While plaintiff complained of general arthritis, pain in both shoulders, elbows, hands and legs, an examination of her joints revealed no effusion, and no swelling was noted.  Plaintiff's range of movement overall was slightly decreased in the shoulders (AR 97).  Dr. Twombly opined that the plaintiff has a medically determinable impairment of arthritis and hypothyroidism, and that her impairments would reasonably cause some of the symptoms that the clamant alleges, "[h]owever, the severity of the symptoms that the claimant alleges is not supported by the objective findings."  (AR 101).  Although the ALJ gave only limited weight to Dr. Twombly's finding that plaintiff could perform a significant range of medium exertional work (AR 20), the specific findings by Dr. Twombly are not inconsistent with the ALJ's RFC assessment of plaintiff, and therefore provide some support for that conclusion.

In accepting the evaluations of Drs. Perea and Twombly, the ALJ also considered the medical evidence contained in the records of plaintiff's treating physicians, Drs. Rocky Khosla and Abdul Sidduqui.  He found that the findings

contained in their examinations of plaintiff between February 2000 and November 2002 were consistent with the evaluations of Drs. Perea and Twombly (AR 17-18).

Plaintiff was apparently treated by Dr. Khosla at the University Family Medicine Center in Pueblo, Colorado between February 2000 and June 2001 (AR 84-92). His clinical notes reflect that on February 8, 2000 plaintiff complained of pain in her arms, shoulders, elbow, wrists and hands, as well as in her knees and hips (AR 86). Dr. Khosla's examination revealed no serositis[4], some grinding on flexion extension, and an essentially normal hip examination (*id.*).  Dr. Khosla suggested that plaintiff might have osteoarthritis, but wanted to do more testing (*id*).  The testing was delayed because of plaintiff's schedule and she was apparently treated with anti-inflammatories between March and June 2000, when she was again seen by Dr. Khosla (AR 85). Although plaintiff was complaining of discomfort, and stated that she "gets to the point where sometimes she can't even really work because of the joint pain," the blood tests administered to plaintiff showed that her uric acid was normal, her "sed rate"[5] was normal, her ANA[6] was non-reactive, and her rheumatoid factor was negative (AR 85).

---

[4]  Serositis is inflammation of the serous tissues of the body.  The serous tissues line the lungs (pleura), heart (pericardium), and the inner lining of the abdomen (peritoneum) and organs within.
<http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=serositis&action=Search+OMD.>

[5]  A sedimentation rate, or sed rate, is a blood test that detects and monitors inflammation activity.  It is measured by recording the rate at which red blood cells (rbcs) sediment in a tube over time.  It increases (the rbcs sediment faster) with more inflammation.
<http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=sedimentation+rate+&action=Search+OMD.>

[6]  ANA, or antinuclear antibody, is an antibody that react against components of the cell nucleus such as DNA, RNA, histone or non-histone proteins.  These antibodies are present in a variety of immunologic or autoimmune diseases including systemic lupus erythematosus, systemic sclerosis, scleroderma, Sjogren's syndrome, rheumatoid arthritis,

Plaintiff's next visit with Dr. Khosla was apparently on June 4, 2001, when she reported that she felt that the "rheumatoid arthritis is actually doing okay and she has not had too much stiffness"  other than for an hour or so in the morning when she first gets up (AR 84).  The doctor's assessment states that plaintiff's "joints are doing okay" and continued use of Celebrex was "okay." (*Id*.).  It does not appear that plaintiff was seen by Dr. Khosla after that date.

During the period from November 2001 through February 2002, plaintiff apparently was being seen by Dr. Siddiqui (AR 93-95).  His clinical notes reflect that plaintiff's initial visit was on November 1, 2001, when she came in to "get acquainted" with the doctor and obtain a refill of her medications (AR 95).  On that date she "had no acute complaints." (*Id*.).  His notes contain no mention of pain in her back, arms, shoulders, elbow, wrists, hands, or her knees and hips.  She was seen by Dr. Siddiqui again on November 16, 2001, but none of the reported symptoms related to pain in her back, arms, shoulders, elbow, wrists, hands, or her knees and hips (AR 94-95). On February 1, 2002, plaintiff did complain to Dr. Siddiqui of general arthritis, pain in both shoulders, elbows hands, and legs (AR 94).  His examination revealed no joint effusion or swelling, and only a "lightly decreased" range of motion.  He performed a PDXA and t-score test, although his notes do not reveal the significance of the reported score (*id*.).  He prescribed Celebrex and a check of her "sed rate" (*id*.).  Further notes of February 14, 2002 and February 18, 2002, reflect telephone calls with plaintiff regarding changes in her prescriptions, partly due to insurance coverage issues, but

polymyositis, dermatomyositis and in persons taking hydralazine, procainamide or isoniazid.  A serologic measurement for antinuclear antibodies can aid in the diagnosis of unexplained arthritis, rashes or chest pains.
<http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=ANA&action=Search+OMD.>

partly due to the effectiveness of the prescribed medication to quell pain.  No further visits with Dr. Siddiqui were referenced in the medical notes submitted prior to the hearing before the ALJ.

Shortly before the hearing on March 4, 2004, plaintiff's counsel submitted an additional set of medical records from Dr. Siddiqui for the period between June 2002 and January 2004 (AR 122-26) and a medical assessment of plaintiff's "ability to do work-related activities in a regular work setting" dated February 24, 2004 (AR 118-121) (emphasis in original).  The ALJ considered the  records and found that they did not support a finding of disability (AR 18).  He noted that while the August 2002 notes reflect a complaint of upper and lower back pain, fatigue and depression, and a possible diagnosis of fibromyalgia, there was no treatment prescribed and the examination was more focused on concern over a possible breast nodule (AR 18). While the subsequent notes refer to complaints of pain in the upper and lower back and shoulder, and treatment of plaintiff with injections of lidocaine, (AR 124-25), the ALJ noted that such visits and notes did not relate to the relevant time period preceding September 2002 when plaintiff was insured (AR 18).

As further discussed below, the ALJ also refused to give "any significant weight" to Dr. Siddiqui's work related assessment, which stated that plaintiff had moderate to severe osteoarthriitis, and set forth various limitations on plaintiff's ability to work (AR 119).

**PLAINTIFF'S APPEAL**

On appeal plaintiff argues that substantial evidence in the record does not support the ALJ's determination for two reasons.  She first argues that the ALJ did not give proper weight to the opinion of Dr. Siddiqui as a treating physician based on his

February 2004 assessment (Plaintiff's Brief at 3).  She also argues that the ALJ failed to properly evaluate her nonexertional limitation of fatigue, leading to an erroneous conclusion that she could perform light work on a full-time basis contrary to what plaintiff refers to as Grid Rule 201.02 (*id.* at 4).

**ANALYSIS**

A.      **Whether the ALJ Gave Proper Weight To the Opinion of Dr. Siddiqui As A Treating Physician.**

The medical assessment completed by Dr. Siddiqui on February 24, 2004 consists of inserted answers to various preprinted questions indicating that plaintiff would have to lie down for at least 15 minutes or more every two hours throughout the day, miss 4 or more days from work per month, and would lose 1 hour or more per day of productivity due to preoccupation with her medical condition (AR 119).  He also opined that she was limited to lifting or carrying 10 pounds occasionally (AR 120).  However, the assessment placed no limitations on her ability to stand, walk or sit (AR 120).  It opined that plaintiff could frequently climb and balance, occasionally stoop, but should avoid as much as possible crouching, kneeling and crawling (*id.*).  It also opined that plaintiff could reach, handle and finger frequently, and placed no limitations on her ability to move machinery, work at heights, be exposed to dust, noise, fumes or humidity (AR 121).  It did state that she should avoid vibration and extreme temperatures (*id.*).

Although some of Dr. Siddiqui's assessments are consistent with the residual functional capacity found by the ALJ–for example the lack of restrictions on standing, walking and sitting, as well as the finding that she could operate machinery–the ALJ found that the assessment was not entitled to significant weight for four reasons.  First,

as indicated in the record, Dr Siddiqui did not actually examine plaintiff at the time he filled in this form (*see* AR 129; 150-51).  Thus, the opinion appears to be based on plaintiff's self-reporting and not objective medical evidence or findings.  Second, the claimant's medical records as described above did not provide objective support for such limitations.  Third, the opinion was given in 2004, and despite the fact that it purports to state her condition as on the onset date in 2001, there is no evidence that Dr. Siddiqui saw plaintiff before February 2002.   Moreover, this assessment is contradicted by other medical findings and evidence in the record (AR 20).

Plaintiff is correct in arguing that under 20 C.F.R. § 404.1527(d)(2) a treating physician's opinion may be entitled to controlling weight, but only to the extent that it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence" in the case record.  Here, the ALJ found a lack of clinical and laboratory findings to support the February 2004 opinion of Dr. Siddiqui, and as noted above the clinical notes from the relevant period from Drs. Khosla and Siddiqui were inconsistent with the limitations contained in the February 2004 opinion.  In addition, the assessment by Dr. Siddiqui was inconsistent with the residual functional analyses of Drs. Perea and Twombly, which were issued during the relevant period, and which do contain objective clinical findings.

The regulation upon which plaintiff bases her argument also provides that when discounting the weight to be given to medical opinions from treating physicians, it is incumbent on the ALJ to give good reasons for the weight given to a treating physician's opinion.  20 C.F.R. § 404.1527(d)(2).  The ALJ did give good reasons for not giving controlling weight to the opinion of Dr. Siddiqui, as discussed above.  This

Court finds no error in the ALJ's decision to give insignificant weight to Dr. Siddiqui's assessment of February 2004.

**B.    Whether the ALJ Failed To Properly Evaluate Plaintiff's Nonexertional Fatigue, or Erroneously Concluded That She Could Perform Light Work on a Full-time Basis Contrary to Grid Rule 201.02**

Although plaintiff's argument under this heading is not entirely clear to the Court, it appears that she is arguing that the ALJ should have found her disabled under Grid Rule 201.02 (20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.02).  However, as the general introduction to the grid rules states, the rules apply to assist a disability determination "where an individual with a severe medically determinable physical or mental impairment is not engaging in substantial gainful activity **and** the individual's impairment prevents the performance of his or her vocationally relevant past work." *Id.* at § 200.00(a) (emphasis added).  But here, where the ALJ properly found that plaintiff could return to her past relevant work, the grid rules have no application for purposes of making a disability determination.  The burden at the fourth step of the process was upon the claimant to demonstrate that she "could not return to her past work."  *Potter v. Secretary of Health and Human Services*, 905 F.2d 1346, 1349 (10th Cir. 1990).  If the ALJ makes a determination of no disability at step four, he need not inquire into the criteria at step five.  *See also Barnhart v. Thomas*, 540 U.S. 20, 25 (2003).  Thus, the grid rules do not come into play in this case.

Plaintiff also appears to argue that the ALJ failed to properly evaluate whether she had transferable skills (Plaintiff's Brief at 2).  But again, as the issue here was whether plaintiff could return to her past relevant work, a transferrable skills analysis was not required.  As stated in Social Security Ruling 82-41:

> When transferability of work skills is at issue. Transferability
> of skills is an issue only when an individual's impairment(s),
> though severe, does not meet or equal the criteria in the
> Listing of Impairments in Appendix 1 of the regulations but
> does prevent the performance of past relevant work (PRW),
> and that work has been determined to be skilled or
> semiskilled.

1982 WL 31389 at *1. Here, because plaintiff was found at step four to be capable to
returning to her past relevant work, the issue of transferable skills issues does not
come into play.

Finally, plaintiff asserts that the ALJ failed to properly take into account her
"ongoing fatigue problems." (Plaintiff's Brief at 4). Although plaintiff asserts that her
"fatigue" is "documented" in the medical records, the Court notes that each reference to
fatigue is plaintiff's subjective complaint and not the assessment of a physician based
on any ascertainable medical criteria (*see* AR 85, 122, 126). Moreover, as noted
above, none of the doctors who evaluated plaintiff in 2001 or 2002 listed fatigue as
a factor that would preclude plaintiff from performing substantial gainful employment.
Plaintiff cites to an April 1999 stress test report apparently performed at the request of
Dr. Khosla (AR 127). This test was performed well before the claimed onset date, and
as the ALJ points out, it related to the issue of whether plaintiff had a cardiac
impairment (AR 17). It does not appear related to plaintiff's complaints of fatigue.

Moreover, even though the stress report states that plaintiff may have a
"[m]oderate to severely reduced exercise capacity for age" (AR 127) that does not
mean plaintiff is unable to work. Plaintiff testified that she does do house work
including laundry and dishwashing, although it takes her "twice as long" to perform
these tasks than it did five years earlier (AR 144). She testified that she could lift
comfortably 10 pounds and carry the burden 20 to 30 feet, although her arms would

hurt if she tried to lift 20 pounds (AR 146-47).  She also testified that steroid shots received from Dr. Siddiqui alleviated the shoulder pain for periods of three to four months at a time (AR 148).  While plaintiff testified that lifting or stress might exacerbate her pain even while she was on the steroid shots, she never testified that she was unable to do any work at all (AR 148-49).

While it may be that plaintiff is limited somewhat in what she can do because she feels she is in pain or discomfort, the Tenth Circuit has said on a number of occasions that "disability requires more than mere inability to work without pain." *See e.g. Ray v. Bowen*, 865 F.2d 222, 225 (10th Cir. 1989).  Plaintiff here testified that she had driven frequently until approximately a year before the hearing, and that she gave up driving because her hands hurt.  But she never testified that she was unable to drive, and it appears that during the relevant period she did drive frequently, as she testified "I used to drive quite considerably until lately." (AR 136).

Given the lack of objective medical evidence to support plaintiff's claim of disabling back, shoulder, elbow, wrist and arm pain, and given her past experience and work as a van driver, there is sufficient evidence in the record to support the ALJ's finding that plaintiff could perform her past relevant work as a van driver without exceeding her residual functional limitations, and that her asserted fatigue did not amount to a serious impairment.

**CONCLUSION**

For the reasons set forth above, the Court finds that there is substantial evidence in the record to support the finding that plaintiff was not under a "disability" as defined in the Social Security Act and therefore the Commissioner's decision is

13

AFFIRMED.  The Clerk of the Court shall enter judgment accordingly. The oral

argument set for March 24, 2006 at 10:00 a.m. is VACATED.

DATED:  March 10, 2006

BY THE COURT:

*s/ Phillip S. Figa*

_____

Phillip S. Figa
United States District Judge